**Electronically Filed**
**Intermediate Court of Appeals**
**CAAP-15-0000545**
**05-APR-2019**
**08:49 AM**

NO. CAAP-15-0000545

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I

ROBERT H. JOSLIN dba HAWAII PUBLIC ADJUSTERS,
Plaintiff-Appellee/Cross-Appellant,
v.
OTA CAMP-MAKIBAKA ASSOCIATION, INC., a Hawaii nonprofit
corporation, Defendant-Appellant/Cross-Appellee,
and
TAIRA PROCTOR and MELINDA DOMAGSAC,
Defendants-Appellees/Cross-Appellees,
and
ALTERRA EXCESS & SURPLUS INSURANCE COMPANY,
Interpleader-Appellee/Cross-Appellee

APPEAL FROM THE CIRCUIT COURT OF THE FIRST CIRCUIT
(CIVIL NO. 14-1-2086-10 (KKS))

MEMORANDUM OPINION
(By: Ginoza, Chief Judge, Fujise and Leonard, JJ.)

Defendant-Appellant/Cross-Appellee Ota Camp-Makibaka Association, Inc. (**Association**) appeals from a "Judgment" entered on June 24, 2015, by the Circuit Court of the First Circuit (**circuit court**),[1] and also challenges: an "Order Granting in Part and Denying in Part Plaintiff Robert H. Joslin DBA Hawaii Public Adjusters' Counter Motion for Summary Judgment on Counts I, II, III, IV and V of Complaint Dated October 2, 2014 Against

---

[1] The Honorable Karl K. Sakamoto presided.

Defendant Ota Camp-Makibaka Association, Inc., Taira Proctor, and Melinda Domagsac" (**Summary Judgment Order**), filed January 2, 2015; an "Order Denying Defendant Ota Camp-Makibaka Association, Inc.'s Motion to Dismiss Complaint Filed on October 2, 2014" (**Order Denying Dismissal**), filed January 2, 2015; and an "Order Granting Plaintiff Robert H. Joslin DBA Hawaii Public Adjusters' Motion for Award of Attorneys' Fees and Costs" (**Attorney's Fee Order**), filed June 24, 2015.

Plaintiff-Appellee/Cross-Appellant Robert H. Joslin, DBA Hawaii Public Adjusters (**Joslin**) cross-appeals from the Summary Judgment Order and the Attorney's Fee Order.

On appeal, the Association argues the circuit court erred by: (1) concluding that Hawaii Revised Statutes (**HRS**) Chapter 431 is the more specific statutory provision over HRS Chapter 514B as it relates to the payment of insurance proceeds where a public adjuster is involved; (2) concluding that HRS § 431:9-230 (2005) grants Joslin the right to receive earned commissions for adjusting a claim, payable out of proceeds from Alterra Excess & Surplus Insurance Company (**Alterra**) paid to the Association under the Association's property insurance policy (**Policy**); (3) concluding that the Association was unjustly enriched by Joslin's contribution of labor and expertise; and (4) granting attorney's fees to Joslin.

On cross-appeal, Joslin contends that: (1) the circuit court should have granted an equitable lien to Joslin against the proceeds paid by Alterra; (2) the circuit court erred in concluding that the Association did not tortiously interfere in Joslin's contract with Taira Proctor and Melinda Domagsac (collectively, **Defendant Homeowners**) because there was no privity of contract between Joslin and the Association; and (3) should attorney's fees not be awarded under HRS § 632-3 (2016), attorney's fees are merited under either HRS §§ 514B-157 (2018) or 607-14 (2016).

For the reasons discussed below, we vacate and remand.

## I. Background

### A. Undisputed Facts

In this case, Joslin seeks to be compensated for his actions as a public adjuster on a claim made against an insurance policy issued to the Association for fire damage to a detached home located on Leowaena Place, in Waipahu, Hawaiʻi (**Subject Property**). The Subject Property was owned by the Defendant Homeowners and subject to the "By-Laws of the Association of Apartment Owners of Ota Camp" (**Bylaws**).

On September 19, 2013, a fire destroyed the Subject Property.

On September 20, 2013, the Association submitted a claim to Alterra for all units damaged in the fire. The Association's adjuster confirmed the claim the same day, and inspected the site the following day.

On September 21, 2013, Joslin, a Hawaiʻi licensed Public Insurance Adjuster, entered into a contract with the Defendant Homeowners to adjust their claim for damages to the Subject Property in exchange for a fee totaling twelve-percent of the insurance proceeds obtained, plus applicable taxes (**the Contract**). The Contract states, in relevant part:

> CLIENT'S ACCEPTANCE OF PERCENTAGE FEE AND OTHER FEES PAYMENT CLAUSE: Client or Clients or their subsequent heir(s) or benefactor(s) or trustee(s) do hereby agree to pay [Hawaii Public Adjuster (**HPA**)] a sum equal to 12% (Twelve Percent) as a fee charge against all monies obtained, received or recovered by compromise, or agreement or judgment against the insurer, its subsidies or their agents- plus any outside and separate expert consultants' fees that may be required for the claim- plus a 4.166% SOH GET sales tax. APPROVAL FOR INCURRING ANY CONSULTANT'S FEES WILL FIRST BE OBTAINED FROM THE CLIENT IN WRITING.
>
> . . . .
>
> PAY WHEN PAID CLAUSE: The Client hereby agrees to pay, and shall authorize to pay, all HPA invoice(s) immediately when presented. Any PIA invoice shall not be due prior to the primary loss payment being issued from the insurer. Each payment pertaining to this claim(s) shall be remunerated to HPA in the promptest manner.

> ENGAGEMENT NOTICE: The Client does herein further agree that the amounts eminently due under this contract shall be issued as a joint check naming Hawaii Public Adjusters and the client(s). The assignment of the insurer's payments is for the security of monies to be paid and owing to HPA. The Client(s) shall execute an ENGAGEMENT NOTICE TO INSURER(S). The separate document provides, in part, a notice to the insurer(s), agents, adjusters, any mortgage company named and any property financer or lien holders named or unnamed in the policy. The engagement notice is without regards to the position or positions held or encumbrances on or upon or against the client or the clients' insured property; of HPA's primary position with regards to amounts owed. The notice also provides other information concerning the engagement and representation of HPA. The Client(s) hereby acknowledges and further accept this additional document as being part of this contract by initialing below.

On the same day, Defendant Homeowners signed an "Engagement Notice to Insurer(s), Agents, Adjusters, Contractors and Mortgagees" (**Engagement Notice**).

Over the next several months, Joslin, on behalf of the Defendant Homeowners, pursued insurance proceeds for the Subject Property claim from Alterra.

On December 18, 2013, Joslin filed a complaint with the Insurance Division, State of Hawaii (**Insurance Division Complaint**) arguing, *inter alia*, that Alterra has failed to timely perform its obligations to Defendant Homeowners pursuant to HRS § 431:13-103(11) (2005) by virtue of Alterra's delayed response or payment.

On February 5, 2014, Engle Martin & Associates, Inc., (**EMCAS**) the third party claim administrative firm assigned by Alterra to investigate the Subject Property claim, sent a check to Joslin for $231,940.00, made out to "OTA Camp Makibaka Association, Inc., Taira Proctor; Melinda Domagsac; and Hawaii Public Adjusters." This amount exceeded the total insurance upon the Subject Property, $219,440.00, as set forth in the Policy.

On February 10, 2014, Joslin sent a letter to the Defendant Homeowners with the EMCAS check for their signature. The letter referred to the check as "your check" and requested that "yourselves and Ota Camp Makibaka Association" sign and return it. The letter stated that the check would be deposited into a client trust account, the fees would be removed, and a new

4

check issued from Joslin. The letter included an invoice for Joslin's services totaling $28,992.31.

On February 14, 2014, Richard Ekimoto (**Ekimoto**), legal counsel for the Association, stated in an email to Equity Properties (**Equity**), the property management company for the Association, that under the Bylaws, the Association is responsible for the repair of the unit. Thus, if the Association signs the check over to the Defendant Homeowners and they do not repair the unit, the Association will have breached its duty and be liable to the current owners.[2]

On September 4, 2014, Ekimoto sent a letter to EMCAS, stating:

> This letter is being written with respect to the above-referenced claim [regarding the Subject Property] and the subsequent settlement payment issued by Alterra. This letter shall also serve as notice of the Association's request that the settlement payment check [pertaining to the Subject Property] be cancelled upon receipt of this letter, and properly reissued as payable to the order of OTA CAMP MAKIBAKA ASSOCIATION, INC., as the sole payee. This request is made pursuant to Hawaii Revised Statutes ("HRS") §514B-143, and the Association in its capacity and as the Named Insured on [the Policy].

## B.   Procedural Background

On October 2, 2014, Joslin filed a Complaint against the Defendant Homeowners and the Association, requesting: (1) a declaratory judgment that Joslin is entitled to fees under HRS § 431:9-230, and that public adjusters are entitled to an equitable lien against insurance proceeds (**Count I**); (2) a finding that the Association was unjustly enriched by Joslin's actions (**Count II**); (3) the grant of an equitable lien against the insurance proceeds (**Count III**); (4) a finding that the Defendant Homeowners breached their contract with Joslin and the implied covenant of good faith and fair dealing (**Count IV**); and (5) a finding that the Association's actions amounted to tortious

---

[2]   On November 18, 2013, two months after the fire, the Defendant Homeowners deeded the Subject Property to Jermaine Kailani Dias and Darcelle Felisse Dias. In this appeal, we do not address the Association's duties with respect to the unit owners.

5

interference in the contractual relationship between Joslin and the Defendant Homeowners (**Count V**).

On October 24, 2014, non-party Alterra filed a "Motion to Intervene and for Interpleader Relief."

On October 30, 2014, the Association filed a "Motion to Dismiss Complaint Filed on October 2, 2014" (**Motion to Dismiss**) on the grounds that: (1) Joslin is not entitled to proceeds from the Association's policy because HRS § 431:9-230 is inapplicable and HRS § 514B-143(a)(1) (2006) requires the Association to use all proceeds for the benefit of the Subject Property; (2) Joslin acted outside the scope of his license as a public adjuster and Joslin had no contract with the Association; (3) no provision of law allows for an equitable lien on the insurance proceeds; (4) there was no unjust enrichment because the Association did not benefit from Joslin's services; and (5) the Association did not interfere with contractual relations between Joslin and the Defendant Homeowners.

On November 13, 2014, Joslin filed a "Counter Motion for Summary Judgment on Counts I, II, III, IV, and V of the Complaint dated October 2, 2014" (**Counter Motion for Summary Judgment**).

On December 1, 2014, the circuit court held a hearing on the Motion to Dismiss and the Counter Motion for Summary Judgment. The circuit court granted Alterra's motion to intervene and interplead the disputed proceeds to the clerk of the court for distribution, denied the Motion to Dismiss, and entered the Summary Judgment Order granting in part the Counter Motion for Summary Judgment as to Count I. The circuit court ruled that Joslin was entitled to have his commission paid from the insurance proceeds as a public adjuster because HRS § 431:9-230 is the more specific statute over HRS § 514B-143, and directed that Joslin's commission be paid out of the interpleaded funds. The circuit court also provided rulings in the alternative for Counts II, IV and V in case the circuit court's interpretation of the statutes was incorrect as to Count I.

6

Specifically, the circuit court ruled in the alternative that: (1) the Defendant Homeowners are contractually bound by the Contract to Joslin; (2) for the question in equity, Joslin did confer a benefit on the Association, but there exists a genuine issue of material fact as to the amount of value actually conferred; and (3) the Association did not have privity of contract with Joslin and thus could not have tortiously interfered in the contractual relationship between Joslin and the Defendant Homeowners. The circuit court did not mention the potential existence of an equitable lien for Joslin against the proceeds.

On May 27, 2015, Joslin filed his "Motion for Award of Attorneys' Fees and Costs" given the Summary Judgment Order. Joslin based his claim for attorney's fees and costs on HRS § 607-14 (2016), § 632-3 (2016), and § 514B-157(a) (2018).

On June 24, 2015, the circuit court issued the Judgment pursuant to the Summary Judgment Order.

On June 24, 2015, the circuit court also issued the Attorney's Fee Order in favor of Joslin, awarding $53,217.25 in attorney's fees pursuant to HRS § 632-3 because the court had ruled in favor of Joslin on his declaratory judgment claim in Count I.

On July 23, 2015, the Association timely appealed.

On August 6, 2015, Joslin timely cross-appealed.

## II. Standards of Review

### A. Summary Judgment

The appellate court reviews "the circuit court's grant or denial of summary judgment *de novo*." Accordingly, "[o]n appeal, an order of summary judgment is reviewed under the same standard applied by the circuit courts. Summary judgment is proper where the moving party demonstrates that there are no genuine issues of material fact and it is entitled to a judgment as a matter of law. In other words, summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law."

Kawashima v. State, 140 Hawai'i 139, 148, 398 P.3d 728, 737 (2017) (internal citations omitted) (formatting altered).

Moreover, "summary judgment must be used with due regard for its purpose and should be cautiously invoked so that no person will be improperly deprived of a trial of disputed factual issues." Bhakta v. Cty. of Maui, 109 Hawai'i 198, 207-08, 124 P.3d 943, 952-53 (2005) (citation omitted).

### B. Statutory Interpretation

Statutory interpretation is a question of law reviewable *de novo*. Our construction of statutes is guided by the following rules: First the fundamental starting point for statutory-interpretation is the language of the statute itself. Second, where the statutory language is plain and unambiguous, our sole duty is to give effect to its plain and obvious meaning. Third, implicit in the task of statutory construction is our foremost obligation to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself. Fourth, when there is doubt, doubleness of meaning, or indistinctiveness or uncertainty of an expression used in a statute, an ambiguity exists.

In construing an ambiguous statute, "[t]he meaning of the ambiguous words may be sought by examining the context, with which the ambiguous words, phrases, and sentences may be compared, in order to ascertain their true meaning." Moreover, the courts may resort to extrinsic aids in determining legislative intent. One avenue is the use of legislative history as an interpretive tool.

Kawashima, 140 Hawai'i at 148-49, 398 P.3d at 737-38 (internal citations and quotation marks omitted) (formatting altered).

### C. Attorneys' Fees

[The appellate] court reviews the denial and granting of attorney's fees under the abuse of discretion standard. The same standard applies to [the appellate] court's review of the amount of a trial court's award of attorney's fees. An abuse of discretion occurs if the trial court has clearly exceeded the bounds of reason or has disregarded rules or principles of law or practice to the substantial detriment of a party litigant.

Chun v. Bd. of Trs. of Emps.' Ret. Sys. of State of Hawai'i, 106 Hawai'i 416, 431, 106 P.3d 339, 354 (2005) (internal quotation marks, citations, brackets, and ellipses omitted) (quoting Chun v. Bd. of Trs. of Emps.' Ret. Sys. of State of Hawai'i, 92 Hawai'i 432, 439, 992 P.2d 127, 134 (2000) (citation omitted)).

**III. Discussion**

    **A.    Applicable Statutory Provisions: HRS Chapter 431 or HRS § 514B-143**

        The Association argues that the circuit court erred when it concluded that: statutes in HRS Chapter 431 were more specific than HRS § 514B-143 (2006) regarding commissions owed to Joslin, as a public adjuster, for the insurance proceeds paid through the Policy issued to the Association; and under HRS § 431:9-230, Joslin was entitled to receive his commissions for services rendered in adjusting the claim in this case.

        The relevant provisions in HRS Chapter 431 are HRS §§ 431:9-105 (Supp. 2006) and 431:9-230.  HRS § 431:9-105 provides, in relevant part:

> §431:9-105  **Definitions**.  As used in this article, unless the context otherwise requires:
> "Adjuster":
> (1) Means any individual who:
>     (A)  <u>Acts solely on behalf of either the insurer or the insured</u>, as an independent contractor or as an employee of an independent contractor; and
>     (B)  Investigates for, reports to, or adjusts for the individual's principal relative to claims arising under insurance contracts; but
> (2) Does not include an individual who is:
>     (A)  An attorney at law who adjusts insurance losses from time to time incidental to the practice of the attorney's profession;
>     (B)  An adjuster of marine losses;
>     (C)  A salaried employee of an insurer or salaried employee of an adjusting corporation or an association owned or controlled by an insurer; or
>     (D)  An individual who acts for a self-insurer or for an insured that administers its own group insurance contract.
> "Independent adjuster" means an adjuster representing the interests of the insurer.
>
> . . . .
>
> "Public adjuster" means an adjuster employed by and <u>solely representing the financial interests of **the insured named in the policy**</u>.

(Emphasis added).  Further, HRS § 431:9-230 provides, in relevant part:

> §431:9-230. **Reporting and accounting for premiums**.
> (a) Every licensed adjuster shall have the responsibilities

of a trustee for all premium and return premium funds received or collected under this article.

(b) The licensee, upon receipt of the funds, shall either:

(1) Remit the premiums (less commissions) and return premiums received or held by the licensee to the insurers or the persons entitled to such funds; or

(2) Maintain the funds at all times in a federally insured account with a bank, savings and loan association, or financial services loan company situated in Hawaii, separate from the licensee's own funds or funds held by the licensee in any other capacity, in an amount at least equal to the premiums (net of commissions) and return premiums received by such licensee and unpaid to the insurers or persons entitled to such funds. Return premiums shall be returned within thirty days, unless directed otherwise in writing by the person entitled to the funds.

The licensee shall not be required to maintain a separate bank account or other account for the funds of each insurer or person entitled to such funds, if and so long as the funds held for the insurer or person entitled to such funds are reasonably ascertainable from the books of account and records of the licensee. Only such additional funds as may be reasonably necessary to pay bank, savings and loan association, or financial services loan company charges may be commingled with the premium funds. In the event the bank, savings and loan association, or financial services loan company account is an interest earning account, such licensee may not retain the interest earned on such funds to the licensee's own use or benefit without the prior written consent of the insurers or person entitled to such funds. A premium trustee account shall be designated on the records of the bank, savings and loan association, or financial services loan company as a "trustee account established pursuant to section 431:9-230, Hawaii Revised Statutes", or words of similar import.

(Emphasis added).

In turn, HRS § 514B-143 (2006) provides, in relevant part:

§514B-143 Insurance. (a) Unless otherwise provided in the declaration or bylaws, the association shall purchase and at all times maintain the following:

(1) Property insurance:

(A) On the common elements;

(B) Providing coverage for special form causes of loss; and

(C) In a total amount of not less than the full insurable replacement cost of the insured property, less deductibles, but including coverage for the increased costs of construction due to building code requirements, at the time the insurance is purchased and at each renewal date;

. . . .

(b)  If a building contains <u>attached units</u>, the <u>insurance maintained under subsection (a)(1)</u>, to the extent reasonably available, shall include the units, the limited common elements, except as otherwise determined by the board, and the common elements.  The insurance need not cover improvements and betterments to the units installed by unit owners, but if improvements and betterments are covered, any increased cost may be assessed by the association against the units affected.

For the purposes of this section, "improvements and betterments" means all decorating, fixtures, and furnishings installed or added to and located within the boundaries of the unit, including electrical fixtures, appliances, air conditioning and heating equipment, water heaters, or built-in cabinets installed by unit owners.

(c)  If a project contains <u>detached units</u>, then notwithstanding the requirement in this section that the association obtain the requisite coverage, if the board determines that it is in the best interest of the association to do so, the <u>insurance to be maintained under subsection (a)(1)</u> may be obtained separately for each unit by the unit owners; provided that the requirements of <u>subsection (a)(1)</u> shall be met; and provided further that evidence of such insurance coverage shall be delivered annually to the association.  In such event, the association shall be named as an additional insured.

(d)  The board, in the case of a claim for damage to a unit or the common elements, may:

    (1)    Pay the deductible amount as a common expense;

    (2)    After notice and an opportunity for a hearing, assess the deductible amount against the owners who caused the damage or from whose units the damage or cause of loss originated; or

    (3)    Require the unit owners of the units affected to pay the deductible amount.

. . . .

(f)  <u>Any loss covered by the property policy under subsection (a)(1) shall be adjusted by and with the association.  The insurance proceeds for that loss shall be payable to the association, or to an insurance trustee designated by the association for that purpose.  The insurance trustee or the association shall hold any insurance proceeds in trust for unit owners and secured parties as their interests may appear</u>.

(Emphasis added).

The circuit court held that the definitions of "adjuster" and "public adjuster" in HRS § 431:9-105 were ambiguous and thus could be interpreted liberally to allow public adjusters to represent individuals "named in the policy, covered, or protected by the policy, irrespective of whether the individual is the holder of the insurance policy."  Following this definition, the court found that Joslin and the Association

11

are both trustees for the Defendant Homeowners "who are the beneficiaries covered or protected by the policy" under HRS §§ 431:9-230(a) and 514B-143(f), respectively. The court held that since a public adjuster is involved, HRS § 431:9-230(a) is the more specific statute and thus "[Joslin] is entitled to receive its commissions for services rendered in adjusting the claim." The circuit court ordered that Joslin be paid his commission in the amount of $28,992.31 from the insurance proceeds interpleaded to the clerk of the court.

We agree with the circuit court only to the extent that, in the context of HRS Chapter 431 Article 9, the definition of "public adjuster" in HRS § 431:9-105 is ambiguous as to whether it allows a public adjuster to represent an insured who is not expressly named in a policy, but is nonetheless covered by the policy. HRS § 431:9-105 defines a "public adjuster" as "an adjuster employed by and solely representing the financial interests of the insured **named in the policy**[,]" (emphasis added) which suggests the insured to whom the policy is issued. However, HRS § 431:9-226 (2005) provides that an adjuster is authorized to act "only on behalf of **insureds** if licensed as a public adjuster." (Emphasis added). Reading HRS Chapter 431 Article 9 as a whole, we agree there is ambiguity as to whom a public adjuster is authorized to represent.

We need not resolve this ambiguity, however, because we ultimately disagree with the circuit court's interpretation that HRS § 431:9-230 provides authority for Joslin to be paid commissions out of the insurance proceeds paid under the Association's policy. Rather, this statute deals with an adjuster's responsibilities as trustee "for all premium and return premium funds received or collected under this article." HRS § 431:9-230. Although "premium and return premium funds" are not defined in Article 9, the plain reading of "premium" in the insurance context is meant as "[t]he amount paid at designated intervals for insurance; esp., the periodic payment required to keep an insurance policy in effect." Black's Law Dictionary 1371

12

(10th ed. 2014); see also Merriam-Webster's Collegiate Dictionary 980 (11th ed. 2003) (defining "premium" as "the consideration paid for a contract of insurance[.]"). Indeed, HRS § 431:9-230 references in several parts that the premium funds in issue are for the "insurer" or other persons entitled to the funds. HRS §§ 431:9-230(b)(1) and (2). Nothing in HRS § 431:9-230 suggests that it is addressing insurance proceeds paid by an insurer due to a claim on a policy.[3] We thus disagree with the circuit court's ruling that Joslin was entitled to commissions based on HRS § 431:9-230.

We conclude that HRS § 514B-143 is the applicable statute for purposes of this case. Specifically, HRS § 514B-143(f) provides:

> (f) Any loss covered by the property policy under subsection (a)(1) shall be adjusted by and with the association. The insurance proceeds for that loss shall be payable to the association, or to an insurance trustee designated by the association for that purpose. The insurance trustee or the association shall hold any insurance proceeds in trust for unit owners and secured parties as their interests may appear.

(Emphasis added).

Joslin argues that HRS § 514B-143(f) does not apply to this case because the property insurance required under HRS § 514B-143(a)(1) applies only to the common elements, not to individual units, of the Ota Camp-Makibaka subdivision. We disagree.

HRS § 514B-143(a)(1) provides:

> (a) Unless otherwise provided in the declaration or bylaws, the association shall purchase and at all times maintain the following:
> (1) Property insurance:
>     (A)   On the common elements;
>     (B)   Providing coverage for special form causes of loss; and
>     (C)   In a total amount of not less than the full insurable replacement cost of the

---

[3] We do not suggest that public adjusters are not entitled to commissions, as commissions are clearly contemplated in both HRS § 431:9-229 (2005) and HRS § 431:9-230. Rather, we simply hold that HRS § 431:9-230 does not deal with commissions from proceeds paid on an insurance claim.

13

> insured property, less deductibles, but
> including coverage for the increased costs
> of construction due to building code
> requirements, at the time the insurance is
> purchased and at each renewal date[.]

(Emphasis added).  In turn, subsections (b) and (c) dealing with
the "units" in an association expressly contemplate the property
insurance set out in subsection (a)(1) as covering the "units."[4]
HRS §§ 514B-143(b) and (c) provide:

> (b)  If a building contains attached units, the
> insurance maintained under subsection (a)(1), to the extent
> reasonably available, shall include the units, the limited
> common elements, except as otherwise determined by the
> board, and the common elements.  The insurance need not
> cover improvements and betterments to the units installed by
> unit owners, but if improvements and betterments are
> covered, any increased cost may be assessed by the
> association against the units affected.
> For the purposes of this section, "improvements and
> betterments" means all decorating, fixtures, and furnishings
> installed or added to and located within the boundaries of
> the unit, including electrical fixtures, appliances, air
> conditioning and heating equipment, water heaters, or
> built-in cabinets installed by unit owners.
> (c) If a project contains detached units, then
> notwithstanding the requirement in this section that the
> association obtain the requisite coverage, if the board
> determines that it is in the best interest of the
> association to do so, the insurance to be maintained under
> subsection (a)(1) may be obtained separately for each unit
> by the unit owners; provided that the requirements of
> subsection (a)(1) shall be met; and provided further that
> evidence of such insurance coverage shall be delivered
> annually to the association.  In such event, the association
> shall be named as an additional insured.

(Emphasis added).

We thus reject Joslin's argument that the property
insurance required under subsection (a)(1) pertains only to the
common elements.  Rather, reading HRS § 514B-143 as a whole
establishes that the property insurance referred to in subsection
(a)(1) applies to the units as well.  However, as to "detached"
units, an association board may decide that the insurance under
subsection (a)(1) "may be obtained separately for each unit by
the unit owners[,]" as specified in subsection (c).

---

[4]  In this case, it appears undisputed that the Subject Property is a
detached unit within the Association.

In sum, then, HRS § 514B-143(f) applies in this case and provides in pertinent part: "Any loss covered by the property policy under subsection (a)(1) shall be adjusted by and with the association. The insurance proceeds for that loss shall be payable to the association, or to an insurance trustee designated by the association for that purpose." There is no statutory basis for Joslin to be paid out of the insurance proceeds paid under the Policy issued to the Association.

Thus, the circuit court erred in granting summary judgment in favor of Joslin, and denying the Association's motion to dismiss, with respect to Count I of Joslin's Complaint seeking declaratory judgment.

**B.    The Association did not tortiously interfere in the contract between Joslin and the Defendant Homeowners.**

The circuit court correctly concluded in its Summary Judgment Order that there was no tortious interference by the Association with the Contract between Joslin and the Defendant Homeowners.

The Hawai'i Supreme Court has held that the elements of a claim for tortious interference in contractual relations are:

> 1) a contract between the plaintiff and a third party; 2) the defendant's knowledge of the contract; 3) the defendant's intentional inducement of the third party to breach the contract; 4) the absence of justification on the defendant's part; 5) the subsequent breach of the contract by the third party; and 6) damages to the plaintiff. . . . [I]t is of the essence in an action for wrongful interference with contractual relationships that the plaintiff suffer damages as a consequence of the defendant's conduct, and these damages cannot be speculative or conjectural losses.

Weinberg v. Mauch, 78 Hawai'i 40, 50, 890 P.2d 277, 287 (1995).

In this case, although there is a contract between Joslin and the Defendant Homeowners and the Association acquired knowledge of the contract, not all elements of the claim are satisfied. There is no evidence that the Association induced the Defendant Homeowners to withhold payment from Joslin under the contract. Furthermore, there is no absence of justification on the part of the Association. Rather, as the Association asserts,

15

Joslin had no statutory right to the proceeds because HRS § 431:9-230 does not apply to proceeds from an insurance claim. Here, the Association was justified in taking actions which effectively prevented the Defendant Homeowners from paying Joslin out of the proceeds paid under the policy issued to the Association.

Joslin cannot prevail on his claim that the Association tortiously interfered in the contract between himself and the Defendant Homeowners, and the circuit court did not err in this regard.

C. **There exist genuine issues of material fact as to whether the Association was unjustly enriched under equitable principles.**

The circuit court erred in concluding as a matter of law that the Association was unjustly enriched by the actions of Joslin. Specifically, the court concluded without comment that the Association received a benefit from Joslin because Joslin "caused Alterra to issue an undisputed payment for $231,940.00[,]" and "[i]t would be unjust for [the Association] to retain the benefit of [Joslin]'s contribution of labor and expertise without compensating [Joslin]." Upon review of the record on appeal, we conclude that there exist genuine issues of material fact as to whether the Association was unjustly enriched by the actions of Joslin.

The Hawai'i Supreme Court has held:

It is a truism that "[a] person confers a benefit upon another if he gives to the other possession of or some other interest in money, land, chattels, or cho[o]ses in action, . . . , or in any way adds to the other's security or advantage." Restatement of Restitution § 1 comment b (1937). One who receives a benefit is of course enriched, and he would be unjustly enriched if its retention would be unjust. Id. § 1 comment a. And it is axiomatic that "[a] person who has been unjustly enriched at the expense of another is required to make restitution to the other." Id. § 1. We realize unjust enrichment is a broad and imprecise term defying definition. But in deciding whether there should be restitution here, we are guided by the underlying conception of restitution, the prevention of injustice. See A. Denning, The Changing Law 65 (1953).

16

Durette v. Aloha Plastic Recycling, Inc., 105 Hawai'i 490, 502-03, 100 P.3d 60, 72-73 (2004) (footnotes omitted) (citing Small v. Badenhop, 67 Haw. 626, 635-36, 701 P.2d 647, 654 (1985)) (emphasis omitted).

The dispositive questions in the instant case are whether, when viewed in a light most favorable to the Association, a genuine issue of material fact exists as to: (1) whether Joslin conferred a benefit upon the Association by causing Alterra to issue an undisputed payment for $231,940.00, and (2) whether the Association's retention (of the money resulting from Joslin's labor and expertise without compensating Joslin) was unjust. Id. at 503, 100 P.3d at 73 (citing Simmons v. Puu, 105 Hawai'i 112, 117-18, 94 P.3d 667, 672-73 (2004)).

First, as to whether Joslin conferred a benefit upon the Association by causing Alterra to issue an undisputed payment for $231,940.00, we note that Joslin's investigation and adjustment of the claim on behalf of the Homeowners occurred roughly parallel to the Association's own independent pursuit of the claim.

The Association first initiated the claim on September 20, 2013, the day after the fire, through its own insurance agent, who confirmed the claim the same day. On September 21, 2013, Alterra's adjuster conducted an initial inspection. On October 5, 2013, Alterra's adjuster submitted his report with a Replacement Cost Value (**RCV**) (as required by the Policy) for the Subject Property of $258,128.64, well over the Policy's maximum payable value for the Subject Property of $219,440.00.

Joslin was engaged by the Defendant Homeowners on September 21, 2013, and did not submit his proof of loss binder to the Association's adjuster on behalf of the Defendant Homeowners until October 18, 2013. Over the next two months, Alterra worked through EMCAS to conduct additional inspections and investigate any possibilities for subrogation. Despite Joslin's frequent insistence in various pleadings, there is no

17

evidence that Alterra was preparing to deny the claim due to arson.  Joslin's pleadings are the only documents in the record to use the word "arson."  On December 26, 2013, Alterra's further inspections returned an RCV of $265,707.50, again in excess of the maximum value allowed under the Policy.

Joslin argues in his Answering Brief that his activities, including "expert review of the bylaws, insurance policy, and schedule of properties; production of an extensive 'proof of loss binder'; fending off a subrogation investigation; and persistently pressuring the insurance company to make a payment on the claim through direct communications and communication with the Insurance Division of the State of Hawaii[,]" were directly responsible for the payment to the Association.  In other words, Joslin argues that his activities, rather than the actions of the Association's own insurance agent, Alterra, or EMCAS, are what conferred a benefit on the Association.

While there is evidence showing Joslin's activities, there is also evidence that activities were conducted (both earlier and later than Joslin) by both the Association's own insurance agent and by Alterra through EMCAS.  Thus, there remains a genuine issue of material fact as to whether it would be unjust for the Association not to compensate Joslin.

Joslin claims unjust enrichment because the Association refuses to pay despite the fact that Joslin "acted in good faith and worked cooperatively and in concert with the Association and Defendant Homeowners at all times in attempting to [benefit the parties]"  Badenhop 67 Haw. at 635, 701 P.2d at 653-54.  This formulation misstates the reasoning in Badenhop, which required not only good faith and cooperation by the aggrieved party, but also the existence of a fiduciary or confidential relationship between the parties.  Id. at 636-37, 701 P.2d at 654-55.  According to the court in Badenhop, such a relationship is very broad: any relationship "in which confidence has been reposed and betrayed."  Id. at 637, 701 P.2d at 655 (quoting Meheula v. Hausten, 29 Haw. 304, 314 (1926) (citation omitted)).

In this case, there remains a genuine issue of material fact as to whether such a relationship existed between Joslin and the Association. Joslin repeatedly asserts that his notice to the Association of his representation of the Defendant Homeowners is sufficient to establish that Joslin was also working on behalf of the Association. However, the Engagement Notice that Joslin points to as establishing such a relationship only provides notice to "insurer(s), agents, adjusters, contractors and mortgagees[,]" "any mortgage company or companies named," and "any property financer or lien holders[.]" There is no indication from that language that the Association should have known that Joslin was operating on its behalf.

Finally, in balancing equities, the Supreme Court of Hawai'i has expressed that "he who comes into equity must come with clean hands[,]" 7's Enters., Inc. v. Del Rosario, 111 Hawai'i 484, 494, 143 P.3d 23, 33 (2006), and "whether the party against whom the maxim is sought to be applied engaged in iniquitous conduct is primarily a question of fact[.]" Shinn v. Edwin Yee, Ltd., 57 Haw. 215, 230, 553 P.2d 733, 743 (1976). In this case, viewed in the light most favorable to the Association, Joslin signed a contract with the Defendant Homeowners, then, after reviewing a copy of the Policy, Joslin continued to solely represent the Defendant Homeowners and never directly approached the named insured in the Policy (the Association) about representing the Association in its claim under the Policy. Joslin then claimed both a contractual and statutory right to insurance proceeds which the other party to the contract (the Defendant Homeowners) did not have authority to authorize and which Joslin, as a licensed public adjuster, did not have statutory authority to claim.

Thus, the circuit court erred in concluding in the alternative that there exist no genuine issues of material fact with regard to whether the Association was unjustly enriched by the activities of Joslin.

19

D.   **Joslin is not entitled to an equitable lien against the proceeds.**

Joslin asserts on appeal that the circuit court erred in not concluding that Joslin should be entitled to an equitable lien against the proceeds paid by Alterra. The circuit court made no conclusion or finding on this issue in either its Summary Judgment Order or Judgment, except to say the issue is moot if Joslin prevailed under Count I of the Complaint. As Joslin cannot prevail under Count I of the Complaint for reasons discussed *supra*, we now review the issue of whether Joslin is entitled to an equitable lien.

In his Complaint, Joslin requested an equitable lien against the proceeds solely as a remedy in the event that he prevailed on his claim of unjust enrichment. "This court has observed that '[t]he necessary prerequisite . . . [for] equitable remedies is . . . the absence of an adequate remedy at law.'" Porter v. Hu, 116 Hawai'i 42, 55, 169 P.3d 994, 1007 (App. 2007) (quoting Bd. of Dirs. of the Ass'n of Apt. Owners of Regency Tower Condo. Project v. Regency Tower Venture (Regency Tower Venture), 2 Haw. App. 506, 513, 635 P.2d 244, 249 (1981)). Specifically, upon a ruling in equity, "[r]estitution, . . . may be accomplished 'not only by . . . compelling the surrender . . . of property . . . , but also by imposing an equitable lien upon the property in favor of the plaintiff.'" Badenhop, 67 Haw. at 639, 701 P.2d at 656. Thus, an equitable lien is only available as a means of restitution in equity when other remedies at law are unavailable. In this case, the funds at issue have been ordered interpleaded to the Clerk of the Court and there is no need to grant an equitable lien against them in favor of Joslin; the funds will be distributed by the Clerk of the Court in accordance with the final judgment in this case.

On appeal, Joslin substantially expanded his argument by additionally requesting that an equitable lien be granted in order to give HRS § 431:9-230(b)(1) full effect in protecting

public adjusters' rights to be paid out of the proceeds of an insurance contract for services.

Joslin's argument is without merit. As discussed *supra*, HRS § 431:9-230 does not establish a public adjuster's right to commissions out of proceeds paid under an insurance policy.

      **E.    The Circuit Court erred in granting attorney's fees to Joslin.**

We conclude above that Joslin does not have a statutory right to receive his commissions from the insurance proceeds under the policy issued to the Association, and that the circuit court erred in granting summary judgment for Joslin on his declaratory judgment claim in Count I. Given these rulings, the circuit court also erred in awarding attorney's fees to Joslin under HRS § 632-3.

With regard to Joslin's cross-appeal contention that he is alternatively entitled to attorney's fees under HRS § 514B-157 or § 607-14, we do not reach those issues because they were not addressed by the circuit court.

## IV.  Conclusion

Based on the foregoing, we vacate the Circuit Court of the First Circuit's "Judgment" entered on June 24, 2015, the "Order Granting Plaintiff Robert H. Joslin DBA Hawaii Public Adjusters' Motion for Award of Attorneys' Fees and Costs" entered on June 24, 2015, and the "Order Granting in Part and Denying in Part Plaintiff Robert H. Joslin DBA Hawaii Public Adjusters' Counter Motion for Summary Judgment on Counts I, II, III, IV, and V of Complaint Dated October 2, 2014 Against Defendants Ota Camp-Makibaka Association, Inc., Taira Proctor, and Melinda Domagsac" entered on January 2, 2015. We further vacate the "Order Denying Defendant Ota Camp-Makibaka Association, Inc.'s Motion to Dismiss Complaint Filed on October 2, 2014" entered on January 2, 2015, to the extent that it is inconsistent with this Memorandum Opinion.

21

This case is remanded to the circuit court for further proceedings consistent with this Memorandum Opinion.

DATED:  Honolulu, Hawai'i, April 5, 2019.

On the briefs:

Dennis W. King,
Eric Seeleman,
for Plaintiff-Appellee/
Cross-Appellant.

Richard S. Ekimoto,
Dan C. Oyasato,
for Defendant-Appellant/
Cross-Appellee.

Chief Judge

Associate Judge

Associate Judge

22